May it please the court. Good morning. My name is Michael Perpura. I am counsel to the appellant Albert Hee. I respectfully request to reserve three minutes of my time, of my allotted time, for rebuttal. I see a second lawyer has enlisted, Ms. Amatore. Yes. Are you splitting time? No. You don't have the whole argument. Yes, Your Honor. Well, keep you on the clock. Yes, Your Honor. Okay, go ahead. The government violated its discovery obligations in this case. That is not in dispute. Those failures prevented the court from properly considering and ruling on the March motion to dismiss, which was based on government misconduct in the civil audit. The revenue agent in the case, Crystal Carey, met with two weeks after her request to refer this audit for criminal investigation was declined. In her activity report, Agent Carey fabricated a statement of Mr. Chinaka implicating Mr. Hee. This is outrageous and became the basis, a basis, for the eventual criminal investigation. But it never happened. This was not apparent to Mr. Hee's defense until June of 2015, when the government turned over Mr. Chinaka's grand jury testimony, in which he denied making the statement to Agent Carey. Given that the entire March motion was based upon Agent Carey's misconduct in the audit, and the majority of the oral argument in the March motion concerned a meeting with Mr. Chinaka in November 2008, Chinaka's direct repudiation of her credibility absolutely was Jiglio material and must have been provided to Mr. Hee in advance of the court hearing in April on the March motion to dismiss. This discovery failure, along with other discovery failures, a late produced email. So this was produced in time for trial? It was, Your Honor. So what's the harm here? The harm is that the... This is not a case where you tried the case and then find out there was a source of evidence, right? So I don't get it. Well, this is different than a case where you try the case, evidence is submitted, or the agent testifies, and then you find out later. I just said that. You just said. Yeah. This is, as I said, this is different. I understand. I asked the question. I said, this is different. Yes. So you don't have that case. If you had that case, you'd be in pretty good shape. But in this case, you had the evidence before trial. So what's the... You've had a trial, the evidence was provided, the jury heard it, and they convicted. So what's the harm here? Where's the violation? As I was saying, the harm is that we didn't have it in time for the March motion. The March motion... But that's water under the bridge. You've now had a trial. I mean, you know, if you... Well, yes, yes. Here's what would have happened. If the court would have had the totality of the evidence. Remember, the March motion to dismiss was styled three ways. A motion to dismiss based on the government misconduct. Alternatively, a motion to suppress under Tweal and Grunewald. And third, a request for an evidentiary hearing. When you received the information, how close to trial was it? Five days, four days prior, Your Honor. It was the Friday before trial. When you received it, did you ask Judge Volway to revisit the suppression motion you'd made earlier? Mr. He's defense did not at that time, but I think... I use the word you. I take it you did not try this case. I did not try the case, Your Honor. But no motion was made to Judge Volway to go back and revisit the earlier motion, correct? Not prior to trial. It was post-trial. Was any effort made by trial defense counsel to postpone the trial? No, Your Honor. But again, the focus on the trial, I think, is misplaced. I have another question. At trial, was trial defense counsel able to cross-examine both the grand jury witness and the agent in light of the material produced just prior to trial? No, Your Honor. The government did not call Agent Carey, and that's why this is different. Was there something to prevent the defense from calling her? We believe there was, Your Honor, in the sense that the request to call Agent Carey for the evidentiary motion on her misconduct in the underlying audit was denied by the court in April. What does that have to do with whether you could have called her as a defense witness at the trial on the merits? Well, I think that she had, it would have been not a jury question as to her credibility when she was not being proffered by the government for any purpose. That was a question that should have been in a motion to suppress before the court. So we had made the request and asked for the evidentiary motion. And in Judge Volway's opinion, first of all, the hearing in April dealt extensively on the question of, do I need to have an evidentiary hearing? Her opinion said, Mr. He fell short that he needed to make just some showing of Agent Carey's intent. Did trial defense counsel make any use of the Brady Jiglio material that was produced prior to trial? No, Your Honor. None? I have the same question my colleague does. Where's the beef? Your Honor, respectfully, if this would have been presented to the defense in advance of the April hearing, Judge Mulway denied the evidentiary hearing because he said we need to You know, you've said this before, but that's not the world we live in. I mean, you can have a motion to suppress or a motion dismiss. If you lose it and then have a trial, you don't then get to go back and reconsider the motion. Because at this point, you have, you know, a motion to dismiss is a shortcut that avoids a trial. But once you have a trial, you've had the best due process available under our system. So that washes out any prior, I mean, if there's a motion to suppress that should have been granted, and so the trial was infected by that, then we second-guess the trial. But when you've had a trial with no errors, that washes out all prior. You don't get to say, look, I got convicted, fair and square, but I should have won on the technicality. Well, I disagree on a couple points, Your Honor. I understand your point. Do you have any case supporting the proposition that after you get convicted of the trial, you can go back and reconsider a motion to suppress or a motion to dismiss? Well, Your Honor, I'll give you both civil and criminal cases. I mean, you know, I'll give you the feel. I've been here a long time, probably longer than you've been practicing law, and I've never seen a case like that. But, Your Honor, I think that under the Brady line of questioning and the motion to suppress, one thing... I asked you for a case. Do you know such a case? I do not know of such a case that relies... I don't either. However, I'm not making that argument, Your Honor, because here's what we are saying, that the motion to suppress in March, coupled with the motion to dismiss, the government's discovery failures prevented the court from evaluating the Twheel motion at the time. Under the Twheel motion, we would have made three showings. One, that the agent had a secret criminal intent, and I respectfully submit that any United States district judge presented with evidence, direct contradictory evidence, from a witness saying, I never made that statement, that was then used as a badge of fraud in the criminal fraud referral, demonstrates a secret criminal intent. You've just made a wonderful case for why your predecessor counsel, trial defense counsel, should have moved, at the point that this evidence was received, to reopen the motion to suppress. But that was not done. I understand. We can't go back and reconstruct that. We can't go back and cure the choice errors made by counsel. But, Your Honor, I believe the court has the authority to do so, because... Which court? Both this court and can remand. This is to be considered de novo as a motion to suppress. The evidence at the time, the state of the indictment at the time, consisted of a very large portion of the case that's referred to in our briefing as the ClearCom case. Let me, as a former prosecutor, ask, I think, the same question Judge Kuczynski asked, which is, you have any case from any circuit, anywhere, that says that in a circumstance like this, you can go back and revisit a motion made prior to trial. What's your best case? Your Honor, I think my best case is the standard set that a motion to suppress is considered de novo. The Brady-Giglio cases have, of course, a sanction of... I'm looking for a case similar to this, where the evidence is presented, and for whatever reason, no use whatsoever is made of it at trial. You concede that, correct? Yes, Your Honor. There's a trial on the merits, and the jury considers the evidence and returns a verdict of guilty that would allow an appellate court, the United States Appellate Court, to go back and revisit a motion to suppress that occurred pretty long before trial. What I think, Your Honor, is that you asked for a case similar to this. I don't think there is a case similar to this, because what's unusual about this, among many things, is that the ClearCom part of the case, to which we can point to evidence being gathered subsequent to the criminal intent, five days prior to trial, ClearCom was removed from the case. So that's why there wasn't evidence introduced. But beyond that, I think that the broader picture here is that the court was unaware of the statement or the contested statement of Mr. Chinaka at the time. Who's responsible for that? The government, Your Honor. I would have thought your predecessor counsel, trial defense counsel, is responsible for not bringing it to the court's attention. He didn't have it in April, Your Honor. The moment he got it and was able to assess what he had, he didn't bring it to the court's attention. Correct? That's correct, Your Honor. Let me ask you something else. Assuming you're right about all this, it sounds to me all you said is you had five days before trial as a witness going before the grand jury and saying something different than the government claims you said to the agent. Now, what makes you think that Judge Morley would have believed the witness' testimony rather than believing the agent when the agent said, this is what the witness said to me? Well, two things, Your Honor, and then I did want to reserve some. You know, usually one good thing is best, but go ahead. Number one. Witnesses do lie once in a while. I'm sure you've run into that in your experience as a criminal lawyer. Your Honor, the – You remember the question? I'm sorry, Your Honor? You remember the question? I do remember the question, Your Honor. Okay, so what makes you think that Judge Morley would have accepted, oh, yes, what the witness said before the grand jury was true and the agent is lying? How do we know? Because we have an affidavit from Mr. Chinaka saying he never made that statement. There has been no affidavit submitted by the government to the contrary. That's the reason why we needed evidentiary hearings. You're asking us to do something here, and you're presuming what the outcome – you've been asked by Judge Hawkins why didn't your presence as counsel or, you know, shouldn't your presence as counsel have raised this issue before the district court and asked to reopen the hearing? And I was going to the next step and saying, well, assuming that had happened, we would have had the ruling from the district court as to making findings as to which version of the testimony was correct. You just want us to believe that the one was correct rather than the other. That's not true, Your Honor. It's not my obligation to show what would have happened. It's my obligation here to show that there's a reasonable probability that the outcome of the proceeding may have been different. The proceeding being the motion to suppress. That's right. And even if it's trial, if you present a United States district judge with testimony of the damaging nature of this, and I don't want the court to minimize the magnitude of the statement. This was a statement from the accountant saying, Mr. He doesn't save receipts. He chooses to do things by handshake and roll the dice if he's audited. That then became a badge of fraud in the criminal referral with an editorial comment from Agent Kerry saying, this is a very incriminating statement by the taxpayer's CPA. That statement is being challenged by the witness alleged to have said it. We wanted the opportunity to put that before the court. I submit to you that a United States district court judge, given that challenge to that significant piece of evidence, which was so significant that the government in the grand jury testimony asked Mr. Chinaka about that statement, asked him twice when he said he didn't say it because it was a badge of fraud. I'm sorry. Why was it so important if it was never presented to the jury? I mean, it's one thing if you say let's present it to the jury, but this statement that you say is so important, it's never presented to the jury. What difference does it make? It wasn't presented to the jury because it was important to the government at the time it became a criminal investigation. It was important to the government at the time they were presenting it to the grand jury, and then of course they didn't present it to the trial because Chinaka didn't say it, Your Honor. Okay. So it sounds to me like justice was done. The statement you claim was questionable wasn't presented to the jury. What more can you expect? What more we can expect is the government to uphold its obligations and provide that statement to the defense in time to present it to the court such that it could evaluate whether to hold an evidentiary hearing. The court can say you can't use that statement at all, which they didn't use. That's one possible sanction, Your Honor. We don't know. One sanction is this is so outrageous we're going to dismiss the case. One is let me find what other things were wrong under this misconduct of the audit. That's a defense lawyer's dream, but it seldom happens. Well, it may seldom happen, Your Honor, but that doesn't mean that the court doesn't give the defense an opportunity to make its case to question a witness whose credibility has been questioned, and we did not have that material in time to put it before Judge Mulway pre-trial, again, without the Bagley question. Thank you. We'll hear from the government. Yes, thank you, Your Honor. May it please the court, Larry Tong for the United States. Did you try this case? I did, Your Honor. Were you the lawyer prior to trial? I was one of three lawyers, yes. Okay, were you one of the lawyers that made the decision not to produce this information until five days before trial? I would say yes. What's your excuse? This was not Brady-o. This was Brady or Git-o. I think we'll decide that, but what is your excuse for not producing it until five days before trial? We produced it as a junk statement of a witness that we expected to testify at trial. That's David Chinaka. We did not believe that this was exculpatory in any respect. We did not present any evidence along these lines. To the extent it was Giglio, it could only be impeachment material as to Crystal Carey, the auditor, whose activity report indicated that he did make the statement. I would point out also that in the grand jury testimony, Judge Hawkins, he did not deny making the statement. He says, I don't recall making the statement. That's the way the question was phrased. Do you recall? And he says, no, I do not recall. Did you inform Judge Mulway that you were making this late disclosure at the time? Your Honor, we didn't view this. That's a question that can be answered with a yes or no. We did not inform Judge Mulway that this disclosure was not being made. It was made in the normal course as a junk disclosure. Okay. What is the answer yes or no? We informed Judge Mulway when we produced this information to the defense five days prior to trial. Yes or no? The short answer is no, isn't it? No, the short answer is yes. We advised Judge Mulway that Jenks material was being produced five days before. We did not parse. With a description of what it was? A description of what it was, but we did not parse through and highlight a particular statement here. And, Your Honor, if I may, I understand where the court is going, but if I may, I don't believe that this was Brady. I would submit to the court that you have what is a contemporaneous statement or running log, the activity report. The statement is made by Chinaka to the auditor as recorded in the report. He later says, I don't recall it. That does not mean that it is exculpatory. You know, when I was a prosecutor and I ran the office, I was the U.S. attorney, we had a very simple rule on matters of this type, and I called it the old crap rule and we used a different description. If you look at a document as a prosecutor and your reaction is, oh, my God, that goes to the defense. Whether you think it's Brady, Giglio, Jinx, or hyperbole, it goes to the defense and it goes to them in a timely fashion, but you guys chose not to do that, right? Well, we did not, Your Honor. I might note that the amount of . . . I understand we're here about the impact or the result of that, and you've heard the questions we asked counsel for he, Mr. He. But in my mind, it does not excuse your behavior. Your Honor, if I may step back. First, I would like the court first to take note of the discovery that was provided. It's in the form of a February 11, 2015 discovery letter. It appears in the supplemental excerpts of records starting at page 478. There were 95 DVDs provided and two hard drives provided with literally, I think it's hundreds of thousands of pages of documents. It's not like we were playing hide the ball here. I would also point out that if Your Honor looks at the exhibit list that we filed, it shows that there were multiple memoranda of interviews that were provided. It also . . . One thing that the record reveals is that each of these witnesses, including Mr. Chinaka, had private counsel retained by Mr. He to represent them in all of their dealings with the IRS. So none of this was a surprise in any way, shape, or form. The material, the DVDs, et cetera, that you just described, that was provided long prior to trial, wasn't it? It was, Your Honor. So we're focusing on what was provided five days prior to trial. Which was all of the grand jury transcripts. When did the grand jury sit? This investigation took a period of years. When did the testimony that we're focusing on occur? I'm not sure I have that date, Your Honor. I would guess . . . Was it a year prior to trial? I would guess it was within a year, I would say so, yes. All right. Go ahead. The chronology, if Your Honor notes, is the civil audit ended towards the latter part of 2009. The indictment was brought in 2014. It was then superseded twice in 2015. To answer some of the court's earlier questions, or maybe to add to your comments, there was no prejudice because the indictment covered tax years that had not even occurred at the time of the audit. The defense, I think, conceded earlier, and it is a fact that not a single piece of evidence introduced at trial came from the civil audit except for one particular 1099 form that showed the payment of, I think, $6,000 to a masseuse that was deducted as a business expense, and that issue was entirely undisputed during the trial. Mr. He, the masseuse, and everyone agreed that the payments made to that person were for personal massages and that they were deducted. The focus, as is normally the case, as Judge Hawkins, you well know, having sat where I am and been a U.S. attorney, the focus was on his state of mind, the intent, the willfulness. It was not on whether or not he received the massages. So there is no harm. We had a three-week trial. They had a well-oiled machine working the defense for attorneys who could raise things immediately. Acknowledging your comments, Judge Hawkins, and regretting that it wasn't turned over, but with due respect, it's not like it was a secret to them. They had access to Mr. Chinaka. They had hundreds of exhibits. Your honors can see from the exhibit list that not a single exhibit other than that one document came from the civil audit file. You can see that many of the events that were the core focus of the trial had not even occurred, such as the purchase of the six-bedroom house and cottage in Santa Clara used for the defendant's college dormitory costs so that he wouldn't have to incur those, such as the Disney World trip with the family members going to see the parks and stay at the Animal Kingdom justified by a false memorandum. That occurred long after the audit occurred, such as the Tahiti trip to see a hula festival that was supported by a false memorandum having to do with doing an inspection of an undersea cable. That had not occurred, such as many of the expenditures on the loan-to-shareholder account, which had not occurred at the time of the audit. My point, Judge Hawkins, is accepting that it would have been preferable to turn it over and accepting that that lesson is duly noted and will be learned, there's no harm. They had access to it. They had access to Mr. Chinaka, as demonstrated by Mr. Esbail. Did the defense ask you for a continuance when they received this information? No, Your Honor. Thank you. And, in fact, it is in the record, Your Honor, that at a hearing, I would say, at about the time of the Twill hearing, but a little before, when we had a superseding indictment, I was just coming into the case at that point, and I made a comment to which Mr. He, the defendant, took great exception. I said, well, I expect there will be a continuance, since we're in March and the trial is in June. And he got up, and he was very upset about that, and he advised the magistrate judge, under no circumstances would there be a continuance. So I raised that only because they had the opportunity to do that, and instead they wanted their day in court, which, of course, was given to them. And in the big structure of things, again, if I may, all of this is relevant only to the Twill inquiry. The Twill situation is truly a very narrow circumstance that isn't replicated much, as demonstrated by the case law. It's where, basically, there is a criminal case being investigated under the guise of a civil audit, and where there are affirmative and intentional misrepresentations about the nature of the inquiry and Judge Hawkins' resulting prejudice. And they fell far short of that, both in March, and then again when they renewed it, even having access to all of the materials that they are now complaining about. I think Judge Kosinski says, how do we know the judge would have done anything different? She had it all before her, and she didn't do anything different. She says, I will reconsider, but I do not choose to alter the result. And the defense writes that off. Was a claimed inconsistency pointed out to her? My recollection is it was, Your Honor. And if it was not, with all respect to my friend and dear colleague, Mr. Pieper, that's on them. I mean, that was when they had it, and they had sat through a three-week trial with all of the evidence presented. The judge issued a very thoughtful, searching, and impartial order, going through all of the evidence, saying, here's what I ruled on in March, here's what they raised as new issues justifying reconsideration. I see no basis upon which reconsideration should be granted. And she goes through the same analysis within the Twill framework, where is the prejudice? When did this occur? I believe it was in June that the motion was filed, right, as the jury was. I think the question may be relative to the trial. Yes. This was before the trial or after? There were two motions. Thank you, Your Honor, for the clarification. There were two motions. I think one was filed as the jury was deliberating, and another was filed for a motion for new trial after the verdict. This is after all the evidence was in? Yes, yes. Not before the trial? No, all the evidence was in. And David Chinaka, the accountant, had testified, and the auditor, who is at the heart of all of this, did not testify because we didn't use anything from the civil audit file. And one of your honors had asked, couldn't you have called them? The defense could have called her. There was no prohibition against calling her if they thought that she had some evidence that was exculpatory or otherwise helpful to them. Okay, thank you. Thank you, Your Honor. You're over your time. We'll give you a minute for rebuttal if you wish to take it. One or two points of clarification on some details. Judge Hawkins, the testimony of Mr. Chinaka occurred on August 21, 2013, before the grand jury, and contrary to what Mr. Tong indicated, it wasn't a simple don't recall. He was correct in saying that the way the question was phrased. It's on pages 574 and 575 in the record, in which Mr. Osborne, then the assistant U.S. attorney, asked, because this was important to the government, quote, do you have any knowledge of the fact that during his business operations, Mr. He sort of got a reputation that he preferred to close deals with a handshake rather than with documentation? Answer, no. You don't know anything about that? Answer, no. Question, okay, I have here, this is a report by the revenue agent of a conversation they purportedly had with you. I'm going to read it to you, and you can tell me true, false, or whatever you want to say about it. He then quotes the language that's in question. Do you recall anything like that? Answer, no. So I think he was pretty clear that he didn't say that. He then submitted an affidavit as part of the post-trial motion, specifically disclaiming making the statement. And to Mr. Tong's point as well, this was considered as part of our post-trial motions. I'm sorry, I'm just trying to adjust your point. So when he says, I don't recall, you think that means, no, I didn't say it. Is that what you're? No. I'm not arguing with you. I'm just trying to understand what it is, what your point is. As I said, it's pretty clear. What I'm saying is. It's not clear to me, so make it clear. Your Honor, when asked a direct question about the knowledge of the receipts, he said no. Then when prompted with the statement that was attributed to him, he was then asked, do you recall anything like that? His answer was no, because that was the call of the question. Well, the question is what the question is. If he's asked a question and the question is do you recall, then it's not contradictory to. You can't sort of shape it into being contradictory if it's not. But the prior question was contradicted. And we think that, as Judge Hawkins pointed out. I'm sorry, what was the question again? Read it to me again. Do you have any knowledge of the fact that during his business operations, Mr. He sort of got a reputation that he preferred to close deals with a handshake rather than with documentation? Answer, no. And what was the statement attributed to him that you think is contradictory? Mr. Chinaka said that Mr. He and he, Mr. He, H-E-E, and he, H-E, Chinaka, had talked about keeping receipts and other forms of documentation and that Mr. He was aware of the requirements but chose to close deals with handshakes and would rather play the odds of being audited rather than keep receipts, closing the quote. Do you recall anything like that? Answer, no. So our view is that's jiggly old material. I'm sorry, what you just said is? From the grand jury testimony. Yes, I'm saying I understood that. Now show me the contradictory statement. What is it that this contradicts in the auditor's statement? That Mr. He preferred to close deals with handshakes. When you say that, it means you're not quoting. I really want a quote now. You give me a quote on one thing, give me a quote on another thing. Yes, Your Honor. The first question is not a quote. It's a quote from the grand jury, not what Chinaka supposedly said. The prosecutor paraphrased the statement attributed to him in an effort to elicit the testimony. That's the first question, and I can read that again. Do you have any knowledge of the fact that during his business operations? I don't think you and I are communicating. You have now given us stuff from the grand jury testimony. You claim that that contradicts something else.  Okay. What does it contradict? What does it contradict? And I don't want you to paraphrase. I want you to now give me a quote of the other thing that contradicts. The false statement attributed to Chinaka was that Mr. He was aware of the requirements, but chose to, quote, close deals with handshakes, close quote, and would rather, quote, play the odds, close quote, of being audited than keep receipts. And that's at the record, excerpts of record at 347. And what is that you just read that the quotes come from? That comes from the fraud referral report in which Agent Carey credited or attributed that statement to Mr. Chinaka along with the comment, these are very incriminating statements by the taxpayer's CPA. Okay. I'm sorry. What was this excerpt of record? What? Page 347, Your Honor. 347. Okay. Mr. Rapport, while you're there, the second element besides the criminal intent of Agent Carey is, under Twheel, as I understand it, that there be an affirmative representation by the service that they were conducting a civil audit and not a criminal audit. Where is there an affirmative representation by any IRS agent as to the civil, not criminal, nature of the audit? We believe those occurred. The affirmative misrepresentations occurred in August of 2009, Your Honor, and we detail those in our brief. Specifically, Agent Carey on August 11, 2009, and this is excerpts of record 512, told the taxpayer's representative she was nowhere near finished with the civil audit when a week prior there was e-mail traffic saying that the agent was now working on the potential fraud referral. All right. She said that the taxpayer may have filed, quote, false returns, right? That also occurred on August 11. After that, on August 14th, Yes, Your Honor. Carey indeed gathered a lease from Clear, was it Clearwater? Clearcom, Your Honor. Clearcom. Of the Board of Water Supply and provided some answers to Carey in a response to fax questions dated August 14th. Those fax questions had to do with Clearcom, correct? Yes, Your Honor. That charge was dismissed five days before trial. Yes. So, therefore, whatever evidence was procured by Clearcom or regarding Clearcom after the statement you think was fraudulent by Carey wasn't used at trial. That's correct, Your Honor. I just wanted to clear that up. Yes, but to expand a little further on it, that part was part of the case, still, when the March motion and April hearing on that motion existed. But it wasn't part of the trial. It was not, Your Honor. Thank you. Okay. Thank you. Cases are able to stand submitted. We are adjourned.
judges: Kozinski, Hawkins, Bea